836 A.2d 695

**Beth Ann Ensor KELLY**

v.

**Robert W. KELLY.**

No. 658, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Nov. 25, 2003.

Melissa D. Gray, Towson, for appellant.

Ann M. Turnvull (Turnbull & Sanders, P.A., on brief), Towson, for appellee.

Argued before HOLLANDER, SALMON, and BARBERA, JJ.

SALMON, J.

The marriage of Beth and Robert Kelly was dissolved by a judgment of absolute divorce entered in the Circuit Court for Baltimore County on May 16, 2002.

The divorce was granted after a one-day trial conducted on January 23, 2002. On March 25, the chancellor filed a memorandum opinion and order in which he denied Ms. Kelly's request for indefinite alimony, denied her request for attorney's fees, granted Mr. Kelly's request for use and possession of the marital home for three years, and granted Ms. Kelly a monetary award. Mr. Kelly thereafter filed a motion to alter or amend the judgment, which was granted on April 23, 2002. As revised, the court ordered that Ms. Kelly was to receive a monetary award in the amount of $66,472, and that Mr. Kelly was to transfer to his ex-spouse one-half of the value of a 401K plan valued at $141,378 on an "as[,] if[,] and when basis." No other changes were made.

Ms. Kelly filed this timely appeal and raises four questions, phrased as follows:

1. Did the lower court err in awarding Husband use and possession of the family home for a period of three (3) years following the date of the absolute divorce [i.e., through May 16, 2005] when the youngest child would attain the age of eighteen on March 19, 2004?

2. Did the lower court err in failing to include $89,000 in a savings account, titled solely to Husband, and earned during the course of marriage as "marital property" and, thereafter, fail to consider same in conjunction with the granting of a monetary award?

3. Did the lower court abuse its discretion in denying Wife's request for indefinite alimony based upon an unconscionable disparity of incomes and standards of living between the parties when [h]usband earned $305,000 in the year immediately preceding the divorce and Wife earned $37,000 in that year?

4. Did the lower court err in denying Wife's claim for contribution for counsel fees?

## I. *BACKGROUND FACTS*

Beth and Robert Kelly married in 1980. Two sons were born of the marriage: Matthew, born December 5, 1983, and David, born March 19, 1986.

Mr. Kelly, aged forty-four, has a degree in biological sciences from the University of Maryland. During the first few years of marriage, he worked for the United States Federal Guaranty Company and later for the Chesapeake and Potomac Telephone Company, earning a modest income. In 1985, he joined Alex. Brown, Inc., and commenced working in its technology division. At the time of the trial, he was a director of Alex. Brown and the Chief Technology Officer for its Correspondence Services Business Units.

In 1986, the Kellys built a four-bedroom home on one acre of land in Carroll County, Maryland. While living in that home, the couple enjoyed an upper-middle-class lifestyle.

Ms. Kelly moved out of the marital home in October of 1999. Since that date she and Mr. Kelly have lived separate and apart. Mr. Kelly, who has had physical custody of the children since the separation, still lives in the marital home.

Between 1997 and 2001, Mr. Kelly's income at Alex. Brown averaged $250,831 per year. His best year was 2001, when he earned $305,000. Of that last-mentioned amount, $180,000 was a bonus, and $125,000 was his base salary. At the January 2002 hearing in this matter, Mr. Kelly testified that his annual bonus is based on performance during the previous year. Therefore, the $180,000 bonus he was paid in 2001 was based on his year 2000 performance.

Mr. Kelly testified that bonuses based upon 2001 performance were to be paid in February 2002 and that it was his "firm belief" that he would receive no bonus for that year. He founded his belief upon the fact that Alex. Brown's losses for 2001 exceeded "six figure millions of dollars." Moreover, Mr. Kelly served on an Alex. Brown cost-cutting committee that proposed that senior management, in which he apparently is

included, would receive no 2001 bonuses. In this regard, he further testified:

Q. [W]hat will your total compensation be in the year 2002, this year?

A. Okay. It'll be one hundred and twenty-five thousand dollars.

Q. Which is your salary?

A. Which is my salary. The compensation structure was designed specifically for that. Salaries are paid based on a, kind of a cost of living to give everyone a comfortable living. Our Managing Director's making x, Directors make × and then the rest is based on a bonus structure, depending on how well the firm does.

Q. And what is the status of your job right now?

A. Actually, my job, quite frankly, is in jeopardy, unless I have an interest in moving to New York, which I do not. We have recently gone through an organizational restructuring, and I now work for a management team out of New York. We are having conversations around what portions of our team might be left in Baltimore and what portions are not. The, given that, given that I am—work on the technology side of the house, they're talking about segregating the technology back out to, to the IT Organization proper, and that organization is domiciled in New York City.

Q. Right. And you're not interested in moving to New York, right?

A. I will not move to New York.

Q. Because of what?

A. Because I have no interest in living there or raising two kids there.

Ms. Kelly, aged forty-three,[1] is a graduate of Loyola College. She holds a bachelor's degree in business administration. For three years after her graduation from college, Ms. Kelly

---

1. The ages of Mr. and Ms. Kelly, as set forth in this opinion, are the ages as of January 23, 2002, which is the date that testimony was taken in this matter.

worked as a customer representative for Blue Cross/Blue Shield. She stopped working in 1983 when Matthew was born. Prior to the parties' separation, she worked, both full and part-time, in a number of office-type jobs.

At the time of the January 2002 hearing, Ms. Kelly was employed as a landscaper. She earned $37,601 in 2001. In the four years immediately prior to 2001 her earnings were: 2000–$27,635; 1999–$16,236; 1998–$9,612; 1997–$16,228.

Presently, the parties' older child, Matthew, is in community college. His tuition of $250 a month is paid for, exclusively, by his father. David, who will turn eighteen on March 19, 2004, is a high-school student. His plans are not definite at this point, but he currently intends to either attend a four-year college or, perhaps, go to a technical school.

During their marriage, the parties, anticipating that their children would go to college, created two Uniform Gifts to Minors Act accounts. Presently, there is approximately $30,000 in each account.

### Marital Property

The parties have $146,000 (total) equity in the marital home in which Mr. Kelly presently resides. The parties also own, jointly, approximately 200 shares in a company known as "Farmers & Mechanics" worth approximately $7,000. Marital property, titled in Mr. Kelly's name alone, is:

| | |
|---|---|
| American Century Investment Account | $ 50,349 |
| Alex. Brown Account # 295–90030 | 98,592 |
| Savings Account with proceeds provided exclusively by a 2001 bonus paid by Alex. Brown | 89,000 |
| Coleman Grandview Camper | 4,500 |
| 1999 Suburban | 17,250 |
| 2000 Ford Mustang | 16,695 |
| Motor Cycle | 4,885 |
| Subtotal | $281,271 |
| Bankers Portfolio 401(k) | 141,576 |
| Total | $422,847 |

Marital property in Ms. Kelly's name alone:

| | |
|---|---|
| American Century IRA | $ 23,892 |
| Equity in 1998 Lexus | 8,450 |
| | |
| Total | $ 32,342 |

The proceeds from the 401K plan, which was in Mr. Kelly's name alone, as mentioned earlier, were ordered to be divided equally on an "if, as, and when basis."

In arriving at a monetary award, the chancellor used the following methodology. Excluding the value of the 401K plan in the "Bankers Portfolio," and excluding the $89,000 savings account, which was the after-tax remainder of Mr. Kelly's bonus paid in 2001, the court added the total value of all marital property in Mr. Kelly's name alone; then divided that amount by two and arrived at $98,814. From that latter figure, he deducted the value of the marital property in Ms. Kelly's name alone, which was valued at $32,342, and arrived at $66,472 ($98,814–$32,342).

At the January 2002 hearing, both parties introduced financial statements. Mr. Kelly's statement showed that he had total monthly expenses of $6,658. His largest expense was the $1,220 monthly mortgage payment he makes on the marital home. His gross income is shown on the financial statement as $10,416 per month ($125,000 per year); his net income, after deduction of federal, FICA, medicare, and state taxes, together with deductions for his retirement savings plan, is $6,251. The financial statement shows that he is running a slight monthly deficit, although some of the expenses appear to be either temporary (e.g., $360 per month payment for a therapist/counselor, or, at least arguably, excessive, e.g., $870 a month for recreation and entertainment).

Ms. Kelly's financial statement shows that her total net monthly income is $2,239.59. She lists her expenses as $4,655.59, and claims a $2,426 monthly deficit. Included in her expenses, however, are expenditures that she would like to make, but does not, such as the cost of a telephone, which she

estimated would cost $50 per month;[2] tennis lessons, $258 per month; and gym membership, $79 per month. Ms. Kelly lives in an apartment and pays $1,022 per month in rent. Some of the expenses on her financial statement appear to be temporary, such as storage, $150 per month, and a charge for therapist/counselor, $195 per month. Her major debts are attorney's fees, $1,469; together with about $13,000 in credit card debt. In addition, she lists as debts the money owed on her Lexus ($7,900) and $3,000 for notes payable to relatives.

## II. THE CHANCELLOR'S WRITTEN DECISION DENYING ALIMONY

The trial judge's discussion of Ms. Kelly's alimony request read, in material part, as follows:

The [p]laintiff [Mr. Kelly] is employed as a computer analyst with Alex. Brown, Incorporated. His salary last year was $125,000.00 with a $89,000.00 [sic] bonus....

The [d]efendant has requested alimony in this case. Pursuant to Md.Code Ann., Family Law ("FL") § 11–101, *et seq.*, the present function of alimony is rehabilitation. When awarding alimony, the [c]ourt must consider such factors as the age and health of the parties, their standard of living, their respective financial situations, the duration of the marriage, and the contribution of each party to the well-being of the marriage. Also important in the case analysis is the ability of the party seeking alimony to be fully or partially self-supporting. *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992); *Turrisi v. Sanzaro,* 308 Md. 515, 520 A.2d 1080 (1987).

\* \* \*

The [p]laintiff and the [d]efendant are currently 44 and 43 years old, respectively, and in good health. They were married for nineteen (19) years before separating on October 3, 1999. During their marriage, they appeared to have

---

**2.** Ms. Kelly has no phone other than a cell phone. She would like to have a phone installed in her apartment.

enjoyed a comfortable, upper middle class life style. According to the testimony of both parties, they appeared, however, to save and to be financially secure. The [p]laintiff contributed more financially to the well-being of the family, as the [d]efendant's employment was at a rate of $15.00 an hour. The [p]laintiff's salary as a computer analyst is now more than twice that of the [d]efendant's as a landscaper, but that may well change as thirty (30) workers in the technology department in Alex. Brown Incorporated have been downsized. Also [p]laintiff will not likely receive the $89,000.00 [sic] bonus he was awarded last year due to the poor state of the dot.com industry.[1] Further, the [d]efendant has the ability to be wholly self-sufficient and will be able to pay off her debts.

The parties point the finger at each other in terms of the breakup of the marriage, but for this [c]ourt it was clear that marriage was ended by the [d]efendant's abandonment of the [p]laintiff and their two children. The [p]laintiff has had sole responsibility of the two children and has neither received nor requested child support. The [p]laintiff is also taking responsibility for the children's college expenses. The [d]efendant is able to meet all of her recoverable expense; where one party is sufficiently self-supporting no alimony is required. *Hull v. Hull,* 83 Md.App. 218, 574 A.2d 20 cert. denied, 321 Md. 67, 580 A.2d 1077 (1990). Therefore, the [d]efendant is denied alimony.

[1] Plaintiff is entitled to the full amount of his $89,000.00 [sic] bonus he received February 2001, after the breakup of the marriage as the [d]efendant abandoned the family prior to the time the bonus was earned.

### III. *ANALYSIS*

#### *Issue 1*

■ Section 8–206 of the Family Law Article ("FL") of the Maryland Code (1984, 1999 Repl.Vol.), permits the court to exercise its power to "enable any child of the family to continue to live in the environment and community that are

familiar to the child" and "to provide for the continued occupancy of the family home ... by a party with custody of a child who has a need to live in that home." The word "child" is defined as a person under the age of eighteen years. FL § 8–201(b).

In the case at hand, the trial judge awarded Mr. Kelly use and possession of the family home for three years after the date of the divorce, *i.e.*, until May 16, 2005. The Kellys' younger son, David, will turn eighteen on March 19, 2004. Therefore, as of March 19, 2004, there will be no "minor child" living in the marital home. Ms. Kelly contends that the award of use and possession by the trial court extended for a period of fourteen months "beyond the youngest child's eighteenth birthday" and therefore is "not permissible under the statute."

Although he admits that David will turn eighteen on March 19, 2004, appellee points out that on that date his younger son will still be a senior in high school. Appellee argues:

> Because of legislative amendments to Article 1, § 24 of the Maryland Code and § 5–203 of the Family Law Article of the Maryland Code in 2002, parents' obligation for child support now continues past the child's arrival at the age of 18 if the child is enrolled in high school; presumably, the right to use and possession of the family home is extended as well.

At oral argument, appellant's counsel agreed with appellee that the statute should be interpreted so as to allow the use and possession order to remain in effect until David graduates from high school, which he is scheduled to do in early June 2004. We also agree. Accordingly, this case shall be remanded. On remand, the circuit court should enter an order directing that Mr. Kelly's use and possession of the marital home shall terminate on the date in June 2004 that David Kelly graduates from high school.

### *Issue 2*

The appellant argues that the chancellor erred in failing to include in his calculation of marital property the

$89,000 in appellee's savings account, titled solely in Mr. Kelly's name, that was earned during the course of the marriage.

■ Appellant points out, correctly, that marital property is defined as "property, however titled, acquired by 1 or both parties during the marriage." FL § 8–201.

> Maryland law requires that the trial court undertake a three-step process prior to granting a monetary award: (1) the trial court must initially characterize all property owned by the parties, however titled, as either marital or nonmarital; (2) the court shall then determine the value of all marital property; and, finally, (3) the court may then make a monetary award as an adjustment of the parties' equities and rights in the marital property.
>
> *Strauss v. Strauss,* 101 Md.App. 490, 501, 647 A.2d 818 (1994) (citations omitted), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995); *see also* Md.Code (1984, 1991 Repl.Vol.1997 Supp.), §§ 8–203 to 8–205 of the Family Law Article (FL).

*Gallagher v. Gallagher,* 118 Md.App. 567, 575, 703 A.2d 850 (1997).

As mentioned earlier, the $89,000 bonus (net), which Mr. Kelly received from his employer as a bonus in 2001, was placed by him in a savings account. That money, as all parties agree, was marital property. In performing Step 1, the trial judge said: "[T]he marital property is valued at $329,204, excluding the $89,000." Earlier in a footnote, the chancellor said, "Plaintiff [Mr. Kelly] is entitled to the full amount of his $89,000 bonus he received February 2001, after the break-up of the marriage as the [d]efendant abandoned the family prior to the time the bonus was earned."

Appellant contends, and we agree, that it was error to exclude the $89,000 as marital property in performing Step 1. The case of *Alston v. Alston,* 331 Md. 496, 629 A.2d 70 (1993), is instructive. Viola and Herman Alston were separated in 1985, after a twenty-one-year marriage; while the parties were separated, Mr. Alston won the "Lotto" with an annuity value of over $1,000,000. In *Alston,* the trial court granted

Mrs. Alston a divorce and also granted her a monetary award. In calculating the amount of the award, the trial court divided equally all of the marital property, including the Lotto winnings. The Court of Appeals held that the trial court had *appropriately* considered the lottery winnings as marital property. *Id.* at 505, 629 A.2d 70. The Court, nevertheless, held:

> While no hard and fast rule can be laid down, and while each case must depend upon its own circumstances to insure that equity be accomplished, generally in a case such as this the eighth factor should be given greater weight than the others. Where one party, wholly through his or her own efforts, and without any direct or indirect contribution by the other, acquired a specific item of marital property after the parties have separated and after the marital family has, as a practical matter, ceased to exist, a monetary award representing an equal division of that particular property would not ordinarily be consonant with the history and purpose of the statute.
>
> The trial judge found that the annuity was acquired because Mr. Alston "took the time and effort and money, whatever it cost, to purchase the lottery ticket." While the amount of effort itself may not have been great, the annuity was acquired entirely through Mr. Alston's efforts. This is not a case in which one party has facilitated the other's acquisition of property, directly or indirectly. Mr. Alston, using his own funds, purchased the ticket and won the Lotto. This event was not dependent in any way on the parties' joint efforts or shared life, past or present. At the time, the marriage was, for all practical purposes, over.

*Id.* at 507–08, 629 A.2d 70 (footnote omitted).

In *Ware v. Ware,* 131 Md.App. 207, 217–18, 748 A.2d 1031 (2000), Judge Moylan, for this Court, analyzed *Alston* as follows:

> A sweeping holding such as that urged by the appellant, moreover, would render meaningless the 98% of the *Alston* opinion that preceded it. The Court did not announce a rule of law that after-acquired gambling winnings are not

marital property or are not subject to a monetary award. The Court in *Alston* carefully pointed out that the trial judge must weigh numerous relevant factors and then exercise "sound discretion." Even given facts such as those in *Alston*, the Court of Appeals listed and explained the criteria that should guide the exercise of discretion. It emphasized the special weight that should be given to the eighth factor. It analyzed cases from around the country, 331 Md. at 508–09, 629 A.2d 70, and stressed that in Maryland, unlike in many other states, "equitable" distribution is not necessarily "equal" distribution:

> In making a marital property monetary award, *a trial judge must weigh the relevant factors* in light of the legislative purpose, *and then use his or her sound discretion to arrive at an award that is equitable* and in accordance with the statute. Of course, equal distribution may often be proper, and where that result is equitable and consistent with the legislative purpose, a court should not hesitate to make such an award. *Each divorce situation is different, and must be evaluated individually.* In light of the peculiar circumstances of this case, however, the trial judge erred in awarding half of the Lotto annuity to Mrs. Alston.

331 Md. at 509, 629 A.2d 70 (emphasis added).

The more moderate holding that we extract from the *Alston* opinion is that the trial judge, albeit possessing discretion even under the *Alston* facts, abused his discretion in two separate regards. He failed to give proper weight, in a situation such as this involving after-acquired gambling winnings, to the so-called eighth factor. He also mechanistically failed to distinguish an "equitable" distribution from an "equal" distribution.

Mr. Kelly argues:

The trial court did not err by not including in the monetary award an $89,000 savings account which was titled solely to [a]ppellee.

While Mr. Kelly concedes that the $89,000 in the savings account was marital property, he contends that this specific asset should not be shared with Ms. Kelly in any fashion because of the eighth factor set forth in FL section 8–205(b), i.e.,

(8) how and when specific marital property ... was acquired, including the effort expended by each party in accumulating the marital property....

Appellee stresses, citing *Alston, supra; Quinn v. Quinn*, 83 Md.App. 460, 575 A.2d 764 (1990); and *Wilen v. Wilen*, 61 Md.App. 337, 486 A.2d 775 (1985), that how the asset was acquired must be considered in making a monetary award. Appellee's argument continues:

In the present case, it was undisputed that in the past, [h]usband had received a bonus in February which was based on his efforts and the company's profits during the prior calendar year. In February of 2001, [h]usband received a bonus of $89,000 after taxes for work performed by him in the year 2000. Wife had left the family in October of 1999. It is clear, therefore, that [h]usband's bonus was based solely on his own efforts, and was earned without any form of contribution whatsoever by [w]ife. Therefore, the trial court correctly found that that asset should not be shared with [w]ife.

We agree with appellee that Factor 8 is an important item to be considered. But in this case the chancellor did not consider the $89,000 figure in performing Step 1. Moreover, even if we were to assume, *arguendo*, that the chancellor considered the $89,000 savings account as marital property in performing Step 1, he, in effect, completely excluded it in its overall calculations by focusing on the eighth factor and excluding all others. This is improper. Other factors, such as Factor 3 (the comparative economic circumstances of the parties) must be considered. The fact that appellee could save in 2001 more than twice Ms. Kelly's gross pay for that year simply cannot be ignored.

In addition, appellee's contention that the $89,000 "was earned without any form of contribution whatsoever by [w]ife" is not necessarily true. By October 1999, when the parties separated, Mr. Kelly was in the top tier of management at Alex. Brown, earning $245,632 annually. He remained in that top tier in 2001 when he earned his bonus. Mr. Kelly had worked at Alex. Brown for fourteen years prior to the separation. Upon remand, the court should consider whether during that span Ms. Kelly made non-economic contributions (such as staying at home to raise the children) that helped her spouse ascend the corporate ladder at Alex. Brown. If such non-economic contributions were made, the bonus income received by Ms. Kelly cannot be equated to the Lotto winnings discussed in *Alston, supra.*

Upon remand, the court should reconsider the amount of the monetary award. In doing so, the court should take into consideration *all* the FL section 8–205(b) factors before deciding what, if any, portion of the $89,000 Ms. Kelly should receive.

### *Issue 3*

Ms. Kelly argues that the trial court abused its discretion in denying her request for indefinite alimony.[3] She contends that the evidence shows that there is now, and will be in the future, an unconscionable disparity in income between the parties and that disparity will be accompanied by a wide gap in the standard of living between the parties. In support of this argument, Ms. Kelly points out that the Family Law Article permits courts to award indefinite alimony upon a finding that "even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standard of living of the parties will be unconscionably disparate." FL § 11–106(c)(2). In making this argument, Ms. Kelly acknowledges

---

3. Ms. Kelly made no specific request for rehabilitative alimony. Nevertheless, the chancellor could, if warranted by the evidence, award either rehabilitative or indefinite alimony.

that a chancellor's finding of "unconscionable disparity" is a question of fact, and an appellate court may not reverse that factual finding unless it is clearly erroneous, citing Maryland Rule 8–131(c) and *Roginsky v. Blake–Roginsky*, 129 Md.App. 132, 143, 740 A.2d 125 (1999).

Ms. Kelly also contends that the chancellor's (implied) conclusion that there was no unconscionable disparity in the incomes between the parties was based "upon an erroneous finding of fact." We believe there is merit in these arguments.

On Page 1 of the opinion, the court said that Mr. Kelly's salary "last year [2001] was $125,000 with a $89,000 bonus." The only other time in the opinion where Mr. Kelly's salary is mentioned is on Page 2, where the chancellor said, "The [p]laintiff's salary as a computer analyst is now more than twice that of [d]efendant's as a landscaper." The chancellor then said t..ն Mr. Kelly's salary "may well change as thirty (30) workers in the technology department at Alex. Brown, Inc., had been downsized ... [and][p]laintiff will not likely receive the $89,000 bonus he was awarded last year due to the poor state of the dot.com industry."

As appellant points out, it was undisputed that in 2001 Mr. Brown's income was $305,000—not $214,000 ($125,000 + $89,-000)—as the chancellor found in his written opinion. Mr. Kelly's base salary was $125,000 per year, and in addition, he received a $180,000 bonus in 2001. Of that bonus, after paying taxes, Mr. Kelly claimed he received a net of $89,000.[1] Thus, the chancellor, in arriving at a 2001 income figure, combined a gross income figure of $125,000 and coupled it with a net figure for the bonus. This was unfair to Ms. Kelly because

---

4. It is unclear why appellee netted only $89,000 from his $180,000 bonus. It appears unlikely that he is in an over 50% tax bracket or that out of his $180,000 bonus he paid a total of $91,000 in taxes. According to his 2000 income tax return, showing a $267,005 total income, he paid $75,194 in federal taxes. Because he lived in Maryland, he paid another $20,005 in State taxes for a total of $95,000. If appellee paid $95,000 in taxes on $267,000, one wonders why he would pay $91,000 taxes on a $180,000 bonus.

the annual income figure that he used for her was her gross salary, *i.e.*, $37,601.29.

If the chancellor had used the correct figures, the ratio of earnings of Mr. Kelly when compared to that of his ex-spouse would be greater than eight to one. While the chancellor's statement that the husband's *salary* (excluding bonus) was now "more than twice that of" Ms. Kelly's is literally true ($125,000 is more than twice as much as $37,601), the relative *incomes* of the parties was far greater than that. The language used in the opinion gives us no confidence that the court used the proper factual predicate in denying indefinite alimony.

Appellee acknowledges that the chancellor does say in his written opinion that Mr. Kelly's "salary last year was $125,000 with a $89,000 bonus." Nevertheless, appellee maintains that the chancellor clearly understood that the $89,000 figure was a net figure, not a gross figure. Appellee then proceeds to quote from a portion of the transcript where this fact was pointed out to the chancellor.[5] It is true that the transcript shows that at the time of the January 23, 2002, hearing the chancellor was told that the $89,000 bonus was a net bonus after payment of taxes. But the chancellor's written opinion was filed more than eight weeks after the hearing. Consider-

---

5. The relevant colloquy was between counsel for Ms. Kelly and the chancellor, *viz:*

> Q. Where did the hundred and eighty thousand dollar bonus go?
> A. Well, Uncle Sam gets over 40 percent of that.
> Q. Okay.
> A. So that goes there. The other, the other money, as identified, is the $89,000, and it's sitting in a bank account.
> Q. Well, the $89,000 was the net, was the net bonus for the year—oh, okay.
> THE COURT: I'm, I'm a little confused on how much money he was paid and—'cause I, I did, I did write the figure down. It was one hundred eighty thousand dollar bonus; is that, is that right?
> MS. GRAY: That was what he indicated the bonus was, yes, Your Honor.
> THE COURT: Okay. And then the $89,000 what is that?
> MS. GRAY: He is, says is the net after tax.
> A. That's the net after tax.
> THE COURT: Okay. Now I understand.

ing what the chancellor said in writing, his recollection of what he once understood evidently failed him.

Due to the mistake by the court as to what Mr. Kelly's earnings were in 2001, we are unable to accept appellee's argument that the denial of Ms. Kelly's request for indefinite alimony should be affirmed. Although the trial judge is accorded wide discretion in deciding whether to make an award of indefinite alimony, if the basis for the denial is unsound, justice requires the matter be reconsidered. Accordingly, upon remand the court should decide what, if any, amount of alimony should be awarded.

A question that is likely to recur upon remand is whether the judge who considers this matter should take into consideration, when deciding whether alimony should be awarded, Mr. Kelly's stated intention to pay all future college expenses of his sons. As noted *supra*, the chancellor gave as one of his reasons for denying indefinite alimony Mr. Kelly's stated intention in this regard.

Ms. Kelly argues:

In essence, the trial court found that Husband, in part, owed no duty of alimony to Wife because of his willingness to fund college for the children when, in fact, the actual costs of same are modest; there was no evidence to suggest that the actual cost differs significantly from the projected costs; and the college expense was funded by the parties during the course of the marriage by the creation of Uniform Gift to Minors Act accounts. Thus, the trial court found that Husband could not pay alimony because his current earnings would be used to pay college expenses when, in fact, Husband need not utilize earnings to fund this pursuit, but could utilize the funds saved by the parties during the marriage and designated for that purpose.

This argument, too, has merit. At least based upon the evidence thus far produced, Mr. Kelly's intent to pay college expenses was an improper ground for denial of indefinite alimony. The older son had adequate funds to pay his own current ($250 per month) college expenses. Whether he will

be able to pay future college expenses is too speculative because there was no indication of how much any college he might attend will cost. As for David, the parties' younger son, there was no way for the chancellor to predict whether he will even attend college. If he does continue his education after high school, he has $30,000—in his own name—to pay for it. There was no basis to predict whether that sum will suffice.

Another reason that remand is necessary is that it is unclear *what* the chancellor believed Mr. Kelly's earnings were likely to be in the future. This is important because the court gave as one of its reasons for not giving indefinite alimony the fact that in the future Mr. Kelly "might well" not earn "more than twice" what Ms. Kelly earns because thirty workers in the department he heads had been "downsized." We infer from this that the court meant that Mr. Kelly might lose his job inasmuch as there was no indication that Mr. Kelly was likely to have his base salary reduced. We agree with Ms. Kelly's contention that it is unfair to deny indefinite alimony based upon what could possibly happen. As stated in *Turner v. Turner,* 147 Md.App. 350, 391, 809 A.2d 18 (2002);

> To the extent that the court found that appellant currently earns $175,000 per year, or even $200,000 a year, the finding was not supported by the evidence. Among other factors, the propriety of the annual alimony award of $24,000 must be measured against the income appellee *actually earns.* *See* F.L. § 11–106(b)(9).

(Emphasis added.)

At the time of trial, Mr. Kelly had a steady job. The issue of whether permanent alimony should be granted or denied should have been based on present conditions. If Mr. Kelly's income should be eliminated later because he loses his job, the amount and/or duration of alimony can be adjusted. *See* FL 11–107(b).

Currently, Ms. Kelly's annual income is only thirty percent of Mr. Kelly's, even if he receives no bonus in the future. Upon remand, when reconsidering whether indefinite alimony

is warranted, the court should consider what was said in *Lee v. Lee,* 148 Md.App. 432, 448–49, 812 A.2d 1089 (2002), *viz:*

> In ascending order, Maryland cases have found that the chancellor did not err in granting indefinite alimony to a spouse whose potential income, when compared to the non-dependent spouse's income, bore the following percentage relationship: (1) 22.7%—*Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191 (1993), *aff'd,* 336 Md. 49, 646 A.2d 413 (1994); *25.3%—Ware v. Ware,* 131 Md.App. 207, 230, 748 A.2d 1031 (2000); (3) 28%—*Tracey v. Tracey,* 328 Md. 380, 392–93, 614 A.2d 590 (1992); (4) 30%—*Digges v. Digges,* 126 Md.App. 361, 388, 730 A.2d 202 (1999); (5) 34%—*Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208 (1983); (6) 34.9%—*Broseus v. Broseus,* 82 Md.App. 183, 196–97, 570 A.2d 874 (1990); 35%—*Bricker v. Bricker,* 78 Md.App. 570, 576–77, 554 A.2d 444 (1989); and (8) 43%—*Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994 (1995).

No case cited in *Lee requires* that indefinite alimony be granted simply because the dependent spouse is able to show that his or her income is only thirty percent of that of the non-dependent spouse. *See, e.g., Doser v. Doser,* 106 Md.App. 329, 354–55, 664 A.2d 453 (1995). And, indefinite alimony is not necessarily required simply because there exists a gross disparity of income. But when indefinite alimony is denied and such a disparity exists, it is error to deny the request without explicitly discussing the disparity issue. *Cf. Caccamise v. Caccamise,* 130 Md.App. 505, 522, 747 A.2d 221 (2000)(remand required where the trial court failed to enumerate the factors that influenced an unequal division of marital property).

### IV.

Appellant argues that the court erred in denying her request for attorney's fees.

In *Doser v. Doser, supra,* we said:

> The factors underlying awards of alimony, monetary award, and counsel fees are so interrelated that, when a trial court considers a claim for any one of them, it must

weigh the award of any other. Md.Code Ann., Fam. Law Art. §§ 8–205(b)(9, 10), 11–106(b)(11)(ii), and 11–110(c)(1) (1991 & Supp.1995); *see also, Strauss v. Strauss,* 101 Md. App. 490, 511, 647 A.2d 818 (1994), *cert. denied,* 337 Md. 90, 651 A.2d 855 (1995); *Rogers v. Rogers,* 80 Md.App., 575, 588–89, 565 A.2d 361 (1989); *Holston v. Holston,* 58 Md. App. 308, 327, 473 A.2d 459, *cert. denied,* 300 Md. 484, 479 A.2d 372 (1984). Accordingly, when this Court vacates one such award, we often vacate the remaining awards for reevaluation. *See, e.g., Alston v. Alston,* 331 Md. 496, 509, 629 A.2d 70 (1993)(remanding alimony issue upon reversal of monetary award); *Randolph v. Randolph,* 67 Md.App. 577, 589, 508 A.2d 996 (1986) (vacating monetary award in light of reversal of counsel fees, and vacating alimony for reconsideration in light of new monetary award).

106 Md.App. at 335–36 n. 1, 664 A.2d 453.

Because we are remanding this case for a reconsideration of the monetary award and the issue of whether alimony should be ordered, we shall not decide the attorney's fee issue. Upon remand, the trial judge should consider whether Ms. Kelly is entitled to contribution toward her attorney's fees once a decision as to the monetary award and alimony has been made.

**JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**