# ROBERT V. KENNEDY *v.* BEVERLEY G. KENNEDY

[No. 1252, September Term, 1982.]

*Decided July 8, 1983.*

The cause was argued before MASON, GARRITY and GETTY, JJ.

*Jack C. Sando* for appellant.

*Elizabeth Tennery,* with whom were *Welsh & Tennery* on the brief, for appellee.

GARRITY, J., delivered the opinion of the Court.

The appellant, Robert V. Kennedy, (husband) and the appellee, Beverley G. Kennedy, (wife) were granted a divorce *a vinculo matrimonii* on July 22, 1982 by the Circuit Court for Montgomery County. Judge Rosalyn Bell awarded custody of the parties' daughter to the wife, and custody of their two sons to the husband. Mrs. Kennedy was, *inter alia,* awarded use and possession of the family home for three years, alimony of $700.00 per month, child support of $500.00 per month, a monetary award of $29,350.00, counsel fees of $3,000.00, and private investigator's fees of $1,000.00. The chancellor also ordered the parties and their children to participate in family counseling, at the expense of the husband.

On appeal, Mr. Kennedy asks:

1. Did the trial court act arbitrarily, or was it clearly wrong, in awarding use and possession of the family home to a spouse who was awarded custody of only one of three minor children of the parties and who evidenced no special need to live in the family home?

2. Did the trial court act arbitrarily, or was it clearly wrong, in awarding alimony for an indef-

inite period, when there was no evidence that the respective standards of living of the two parties will otherwise be unconscionably disparate?

3. Did the trial court act arbitrarily, or was it clearly wrong, in awarding alimony to the wife of $700.00 per month, when the evidence indicated that the wife was self-supporting?

4. Did the trial court act arbitrarily, or was it clearly wrong, or did it have jurisdiction to require the parties and all three of their children to participate in family counseling to the extent required by such family counselor or counselors?

We shall briefly state the factual background for this appeal and then answer Mr. Kennedy's questions *seriatum.*

## The Facts

The parties are citizens of Australia, and have resided in Montgomery County for many years. They were married in Australia in 1960, and their marriage produced three children; Troy, born in 1965, Jason, born in 1968, and Bronwen-Sara, born in 1972.

Both parties work in the District of Columbia. Mr. Kennedy is an economist with the International Monetary Fund, earning approximately $3,904.00 per month. Mrs. Kennedy is a staff assistant at the World Bank, earning approximately $1,309.00 per month. The income for both parties is not subject to federal or state tax.

The wife filed a bill of complaint seeking a divorce *a vinculo matrimonii* on the grounds of adultery. She also sought child custody, support, alimony, a monetary award and other relief. The husband answered the wife's bill and filed a cross-bill of complaint alleging constructive desertion.

## I. *Use and Possession of Family Home*

### (a) *Discussion of the Law*

The Annotated Code of Maryland, Cts. & Jud. Proc. Article, § 3-6A-06 provides in pertinent part:

(a) The authority conferred by this section shall be exercised to permit the children of the family to continue to live in the environment and community which is familiar to them and to permit the continued occupancy of the family home and possession and use of family use personal property by a spouse with custody of a minor child who has a need to live in that home.... In exercising its authority under this section, the court shall consider each of the following factors:

(1) The best interests of any minor child;

(2) The respective interest of each spouse in continuing to use the family use personal property or occupy or use the family home or any portion of it as a dwelling place;

(3) The respective interest of each spouse in continuing to use the family use personal property or occupy or use the family home or any part of it for the production of income;

(4) Any hardship imposed upon the spouse whose interest in the family home or family use personal property is infringed upon by an order issued under this section.

(b) When granting a limited or absolute divorce, or annulment, the court may determine which property is the family home and family use personal property.

(c) (1) Regardless of how the family home or family use personal property is titled, owned, or leased, the court may decide that one of the parties shall have the sole possession and use of that property or it may divide the possession and use of the property between them.

(2) The court may also order either or both of the parties to pay all or any part of any mortgage payments or rent, all or any part of the indebtedness related to the property, the cost of any maintenance, insurance, assessments and taxes, and any other similar expenses in connection with the property.

This statute protects the interests of any minor child caught in the cross-fire of a divorce case, and ensures that such a child need not suffer the unsettling loss of his or her home during the course of the litigation. *Pitsenberger v. Pitsenberger,* 287 Md. 20, 410 A.2d 1052 (1980). In *Pitsenberger, supra* at 31, Chief Judge Murphy wrote that Section 3-6A-06 gave "special attention to the needs of minor children to continue to live in a familiar environment." It was further stated that by the statute, the legislature sought "to avoid uprooting the children from the home, school, social and community setting upon which they are dependent."

Two necessary prerequisites that must be satisfied before a spouse can be awarded use and possession of a family home are 1) that the spouse be awarded custody of a minor child, and 2) that there be shown a need for the custodial child to continue to live in the family home.[1] *Strawhorn v. Strawhorn,* 49 Md. App. 649, 435 A.2d 466 (1981), *vacated on other grounds,* 294 Md. 322 (1982).

---

1. In exercising its authority to award use of the family home to the custodial parent, the statute provides that the court consider each of the following factors:

    (1) The best interests of any minor child;
    (2) The respective interest of each spouse in continuing to use the family use personal property or occupy or use the family home or any portion of it as a dwelling place;
    (3) The respective interest of each spouse in continuing to use the family use personal property or occupy or use the family home or any part of it for the production of income;
    (4) Any hardship imposed upon the spouse whose interest in the family home or family use personal property is infringed upon by an order issued under this section.

The Maryland statutes and case law impose no additional prerequisites for a spouse's seeking an award of use and possession and the spouse who obtains a use and possession award need not be awarded custody of *all* of a family's minor children. Nothing in the law prohibits a chancellor from awarding the custody of one child of a family to the mother, and custody of another child of the family to the father, if such a decision serves the children's best interest. *See* J. Ester, *Maryland Custody Law,* 41 Md. Law Rev. 225, 267-68 (1982) (as to discussion of split custody). *Davis v. Davis,* 280 Md. 119, 372 A.2d 231, *cert. denied* 434 U.S. 939 (1977), (custody of six-year old daughter awarded to mother, of two older children to father); *Bryce v. Bryce,* 229 Md. 16, 181 A.2d 455 (1962) (custody of four-year old daughter awarded to mother, of 13-year old daughter and 15-year old son to father). Under the law of Maryland, an award of use and possession may follow an award of custody so long as the spouse receiving use and possession satisfies the two prerequisites of Section 3-6A-06.

### (b) *Application of the Law to the Case*

The chancellor began her analysis of the issue of the family home by conceding that the children ought to be allowed to remain in their own home, but that this ideal situation could not be achieved because of the necessity for dividing child custody between the parties. While neither party is satisfied with this division of custody, Maryland law clearly permits it. There was a reasonable basis for such an award, and for a subsequent award of use and possession of the family home to facilitate the custody award.

In her written opinion, the chancellor stated that neither party had deserted the other, but that both parties "prefer to remain in the marital home rather than leave and give the other some peace." The record surprisingly reveals that the parties continued to cohabit in their Bethesda, Maryland house up to and including the day of trial. The chancellor, however, awarded the wife use and possession of the marital home for three years.

At the hearing in circuit court, the parties presented evidence supporting their belief that the marriage had collapsed without hope of reconciliation. Mrs. Kennedy established that her husband committed adultery and that she had not condoned the offense. Mr. Kennedy, while unable to sustain his allegation of constructive desertion, clearly indicated his desire to end the marriage.

These "skirmishes in their power war", to use the chancellor's apt phrase, had clearly produced detrimental effects on the children. The chancellor, expressing her concern for "the potentiality of maintaining natural family relations", in the midst of the parties' "battle for power over the children", ruled that although either one of the parents would be fit to have custody of the children, the best interests of each child would be served if the sons resided with their father and the daughter with her mother. This division followed the recommendation of the court's investigative officers, and the chancellor's interpretation of the general desires of the children themselves as expressed in *in camera* hearing. We hold, therefore, that there was an adequate basis for the custody award, which satisfied the first prerequisite in Mrs. Kennedy's effort to obtain use and possession of the family home.

Mrs. Kennedy was able to satisfy the second prerequisite for an award of use and possession by presenting evidence of her daughter's desire and need to both live with her mother and continue to reside in her own community. Bronwen-Sara, who was ten years of age at the time, specifically advised the chancellor of her positive feelings toward the neighborhood and of her desire not to move far away from her friends. In light of the statutory intent that minor children, in an effort to provide them a degree of stability, should be allowed to remain in familiar environs, if possible, the chancellor found that a sufficient need had been shown to allow the young daughter to stay with her mother in the family home. *Pitsenberger, supra* at 31-32.

Mr. Kennedy contends that the chancellor erred in awarding use and possession to his wife because Mrs.

Kennedy did not present evidence of her continued need to live in the family home. Mr. Kennedy does not refer us to any authority for the proposition that the adult custodian's needs must be considered by a chancellor in making a use and possession award. The statute clearly confers authority for the award to "a spouse with custody of a minor child who has a need to live in that home." There can be no doubt that the word "who" in the statute refers to the minor child, and not to the spouse. In other words, the child of whom the spouse has custody must be shown to have a need to live in that home. Otherwise, the intent of the statute would be utterly frustrated.

We hold that the ample evidence presented by Mrs. Kennedy of her daughter's need to continue to reside in the family home, in conjunction with the award of the child's custody to her, substantiates the chancellor's award of use and possession of the family home to Mrs. Kennedy.

## II. *Indefinite Alimony*

The chancellor decreed that the husband should pay $700.00 per month to his wife for an indefinite period. The chancellor stated that this award was granted under the provisions of the present domestic relations law. This statute, Md. Code, Art. 16, § 1 (C) (1) (ii) authorizes an award of alimony for an indefinite period when the court finds that:

> Even after the receiving party will have made as much progress toward self-support as can reasonably be expected, the respective standards of living of the two parties will be unconscionably disparate.

Mr. Kennedy contends that no evidence in the record supports such a finding in this case. The record, however, belies his contention, and clearly substantiates the chancellor's findings that the wife's resources are "substantially less" than the husband's, and that their living standards will continue to be "unconscionably disparate" in the absence of an alimony award to the wife.

The record reveals that Mr. Kennedy, as an economist, earns three times the income of Mrs. Kennedy, and that he accumulated a retirement fund which was not completely divided with Mrs. Kennedy. Moreover, Mrs. Kennedy was obligated by the court to pay the mortgage and expenses for the family home, which eventually may be partitioned between both parties. This evidence supports the chancellor's decision, but should circumstances change, the equity court retaining jurisdiction over the case, will be able to modify the decree appropriately. *Hofmann v. Hofmann,* 50 Md. App. 240, 245, 437 A.2d 247 (1981).

### III. *Alimony of $700.00 Per Month*

The chancellor did not declare a specific reason for fixing the award of alimony at $700.00 per month. The husband submits that the chancellor arbitrarily decided on that figure. The record, however, contains an extensive amount of evidence which provides a substantial basis for the chancellor's decision.

Mrs. Kennedy earned a monthly salary of $1,309.00, and Mr. Kennedy earned $3,904.00 per month. They incurred monthly household expenses of between $3,600.00 (husband's estimate) and $4,102.00 (wife's estimate). Toward these expenses the wife contributed approximately $1200.00 and the husband contributed between $2,245.00 and $2,903.00. Mr. Kennedy's payment towards the house mortgage was estimated at between $629.00 per month and $690.00. He also contributed $210.00 per month for utilities.

The $700.00 per month alimony figure could have been determined on either of two bases. Clearly the amount could be based on the mortgage payments and utility expenses which the husband formerly paid, but which now must be paid by the wife. Alternatively, the figure of $700.00 could be based on the difference between the wife's estimate of $2,097.00 for her own expenses, and her salary of $1,309.00. In either circumstances, the determination of the wife's requirements was not clearly erroneous, and will not be

disturbed on appeal. Md. Rule 1086. *Quinn v. Quinn,* 11 Md. App. 638, 276 A.2d 425 (1971).

IV. *Family Counseling*

In her decree, the chancellor ordered that:

> The parties and all three of their children be, and they hereby are, directed to participate in family counseling to the extent it is required by the counselor or counselors who shall be selected in accordance with the Opinion of this Court.

The chancellor stated the counseling for the family would be for the purpose of helping the children, particularly the younger son, at the husband's expense. She further stated that if either parent refused to cooperate in the program, the failure would be "a significant element in making a decision on whether a modification of the child custody is to be ordered." The chancellor's order was based on a report prepared by Ms. Elizabeth J. Riggs, a court investigator. In her report, dated June 25, 1981, Ms. Riggs advised the chancellor that:

> [A]ny custody decision now should be temporary pending the family receiving counseling after the separation. With the separation, a more realistic assessment of both parents would be possible, as they would be forced to deal more with their role as parents to their children than as adversaries to each other. It is strongly recommended that they enter into a therapeutic relationship immediately and that a future custody decision be based on the therapist's assessment.[2]

---

2. The court investigator's recommendation for family therapy finds support in the professional literature. See S. Katz, When Parents Fail: The Law's Response to Family Breakdown (Boston: 1971), wherein the author states:

> From a mental health point of view, a healthy parent-child relationship may be defined as *a mutual interaction between adult and child,* biologically related or not, in which the adult provides

The husband recognizes a need for his son to be counseled, and is willing to pay for this counseling, but he contends that the chancellor lacked a "reasonable jurisdictional basis" for ordering the entire family to participate in counseling.

Our examination of the Maryland statutes and case law reveals several sources of authority by which a chancellor may require non-monetary as well as monetary support from a parent to a child. Md. Cts. & Jud. Proc. Code, § 3-602 (a) grants the equity courts jurisdiction over "the custody, guardianship, legitimation, maintenance, visitation, and support of a child." This statutory provision reflects the general equitable jurisdiction long exercised by chancellors. *Franciscus v. Franciscus,* 31 Md. App. 78, 84, 354 A.2d 454 (1976).

The authority by which the equity courts may safeguard the welfare of children emanated from the State's posture as *parens patriae. Taylor v. Taylor,* 246 Md. 616, 621, 229 A.2d 131 (1967). In this paternalistic role, the State imposes the obligation upon the parents to maintain, care for and protect their children. The State may regulate this custodial relationship whenever necessary, *Townsend v. Townsend,*

the child with affection, stimulation and an unbroken continuity of care. . . .

To behavioral scientists dealing with children in a therapeutic context, the parent's major responsibility is to further the child's emotional and physical well-being so that whatever his endowments, he will have the best available opportunity to fulfill his potential in society as a civilized human being. In other words, the parent's job is to make a positive contribution towards his child's overall healthy development. . . . Therapeutic intervention is justified, then, when the emotional or physical health of the child is threatened.

Some might suggest that this prescription, which *demands positive activity of parents,* and at certain developmental stages the activity of one parent more than the other, goes too far; that it might be more correct not to assign positive tasks to parents, but to merely require that they not interfere with the normal processes of growth. This approach presupposes an unusually strong and malleable human organism whose development is difficult to retard or damage. We recognize that each individual may have unique qualities, some with the potential for growth undisturbed by internal and environmental stresses. However, we think of infants and children as helpless and dependent human beings whose survival depends on adults and an adult world. Without therapeutic intervention, children's psyches may be damaged early, leaving scars which may emerge off and on throughout their lives. *Id.* at 55-56 (emphasis added)

205 Md. 591, 596, 109 A.2d 765 (1954), and virtually without limitation when children's welfare is at stake. *Furman v. Glading,* 36 Md. App. 574, 581, 374 A.2d 414 (1977); aff'd. 282 Md. 200 (1978); 67A C.J.S. Parent & Child § 16, p. 202 (1978).

As is evident from the language of Section 3-602(a) and the case law, the equity courts in Maryland have plenary authority to determine any question concerning the welfare of children within their jurisdiction, and such power does not terminate once the initial custody, support and visitation rights have been established. *Stancill v. Stancill,* 286 Md. 530, 534, 408 A.2d 1030 (1979). Rather, the courts are required to monitor the welfare of children in their jurisdiction and promote the children's best interests. *Stancill, supra; Glading v. Furman,* 282 Md. 200, 208, 383 A.2d 398 (1978).

The statutory provisions and case law make it quite clear that a chancellor cannot be handcuffed in the exercise of his duty to act in the best interests of children. To this end, a chancellor may grant a monetary award of child support which is tailored to meet the circumstances of each case. *Bowis v. Bowis,* 259 Md. 41, 267 A.2d 84 (1970); *Halle v. Halle,* 25 Md. App. 350, 355, 333 A.2d 360 (1975). The exact nature of the child support award and corresponding obligation is entrusted to the sound discretion of the chancellor, whose determination should not be disturbed on appeal unless that discretion is exercised arbitrarily or the chancellor is clearly wrong. *Kramer v. Kramer,* 26 Md. App. 620, 636, 339 A.2d 328 (1975).

A chancellor may also, within the exercise of his discretion, impose such conditions upon the custodial and supporting parent as deemed necessary to promote the welfare of the children. *Kruse v. Kruse,* 179 Md. 657, 664, 22 A.2d 475 (1941) cited in 27B C.J.S. Divorce §308, p. 441 (1959). We will affirm the imposition of such a condition so long as the record contains adequate proof that the condition or requirement is reasonably related to the advancement of a child's best interests. *Deckman v. Deckman,* 15 Md. App. 553, 568, 292 A.2d 112 (1972).

An equity decree based on adequate evidence may obligate a parent to provide monetary support for such obvious necessities as food and clothing, as well as less obvious needs such as college tuition. *Groner v. Davis,* 260 Md. 471, 272 A.2d 621 (1971). Under the provisions of Md. Code, Art. 72A, § 1, which charges parents with a general responsibility for the support, care, nurture, welfare, and education of their children, a parent may be obligated to pay for a child's medical expenses. *Meyers v. Meagher,* 277 Md. 128, 132-33, 352 A.2d 827 (1976).

If such a decree would serve the best interests of the involved children, a chancellor may require a parent to provide specific religious training, *Wagshal v. Wagshal,* 249 Md. 143, 148-149, 238 A.2d 903 (1968), or may require that one parent accommodate the visitation or custody rights of the other parent, *Raible v. Raible,* 242 Md. 586, 219 A.2d 777 (1966); *Stancill, supra* at 539.

We hold that the chancellor did not abuse her discretion or act beyond her authority in ordering Mr. Kennedy to participate with his family in such counseling.

*Judgment affirmed.*
*Appellant to pay costs.*