994 A.2d 911

Thomas **BOEMIO**

v.

Cynthia **BOEMIO.**

No. 57, Sept. Term, 2009.

Court of Appeals of Maryland.

May 11, 2010.

120

Dorothy R. Fait (Majorie G. DiLima of Fait, Wise & DiLima, LLP, Rockville), on brief, for petitioner.

Morriah Horani (Vicki Viramontes–LaFree and Linda J. Ravdin of Pasternak & Fidis P.C., Bethesda), on brief, for respondent.

L. Tracy Brown, Lawrence Anne Ruth, Towson, brief of Amicus Curiae, The Women's Law Center of Maryland, Inc., for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

**122**

ADKINS, J.

In this case, we must determine whether a Circuit Court erred in consulting non-legislative guidelines as an aid when determining the amount and duration of an alimony award pursuant to Md. Code (1984, 2006 Repl. Vol.), Section 11–106 of the Family Law Article ("FL"). We hold that the consultation of guidelines promulgated by a reliable and neutral source that do not conflict with or undermine any of the considerations expressed in the statute is permissible.

During divorce proceedings between Petitioner Boemio and Respondent Seixas,[1] Seixas petitioned the Circuit Court for Montgomery County for an award of alimony. The court, after considering the twelve factors listed in FL Section 11–106(b) and consulting guidelines produced by the American Academy of Matrimonial Lawyers[2] ("AAML"), determined that Seixas was entitled to indefinite alimony of $3,000 per month. Boemio appealed the judgment. The Court of Special Appeals ("CSA") affirmed the award, and we, in turn, affirm the intermediate appellate court.

## FACTS AND LEGAL PROCEEDINGS

Petitioner Boemio and Respondent Seixas were married on October 12, 1985 in the District of Columbia and shortly

---

1. Although the case name lists both parties as "Boemio," Respondent is now known by her maiden name, Cynthia Seixas.

2. According to its website, the American Academy of Matrimonial Lawyers ("AAML") is a national organization consisting of approximately 1600 lawyers who have practiced at least ten years, maintain high ethical standards, and are recognized to be specialists in the field of matrimonial law. *See* About the Academy—American Academy of Matrimonial Lawyers, http://www.aaml.org/go/about-the-academy/ (last visited Apr. 27, 2010). Its mission is to "encourage the study, improve the practice, elevate the standards and advance the cause of matrimonial law, to the end that the welfare of the family and society be protected." *See* AAML, *Considerations when Determining Alimony, Spousal Support or Maintenance* 1 (2007). The organization also professes "[t]o provide leadership that promotes the highest degree of professionalism and excellence in the practice of family law." *See* About the Academy—American Academy of Matrimonial Lawyers, http://www.aaml.org/go/about-the-academy/ (last visited Apr. 27, 2010).

thereafter made their home in Silver Spring, Maryland. The couple had two children within the first five years of the marriage. In 1988, Boemio earned a Master's of Business Administration in finance from George Washington University. This was his second post-graduate degree, as he had already earned a master's degree in economics prior to the marriage. The same year he began his MBA studies, Boemio obtained a position at the Federal Reserve Board. He remains in the Board's employ to this day, leaving only to take a two-year assignment with a Swiss bank.

Seixas had completed high school and one year of college instruction. For much of the marriage, she worked as a retail manager for CVS. That job, however, required 45 to 55 hour work weeks and was, according to Seixas, "very stressful" and "physically strenuous[.]" Consequently, she took a less demanding administrative assistant position, along with a $10,000 pay cut. Boemio's six figure salary and Seixas' supplemental income afforded the couple what the trial court characterized as a "securely middle class" existence. It was "comfortable, but not extravagant." They incurred little consumer debt and managed to pay off the mortgage on their Silver Spring home.

Middle class comfort, however, did not make for a successful marriage. Boemio moved out of the marital home in January 2006. Divorce proceedings began on May 26, 2006, when Boemio filed for divorce in the Circuit Court for Montgomery County, Maryland. In June 2007, Seixas filed an Amended Countercomplaint for Absolute Divorce, seeking use and possession of property, child support, alimony, and other relief.

During a two-day trial before the Honorable Michael D. Mason, Seixas claimed that she was not self-supporting and needed alimony to maintain herself. Boemio argued that Seixas was able to support herself without alimony. The court delivered its decision via oral opinion on July 19, 2007. It found that Seixas would not be able to maintain her accustomed lifestyle without alimony and that an unconscionable disparity existed and would continue to exist between the two

parties. Thus, the trial court awarded Seixas $3,000 per month in indefinite alimony.

Boemio appealed the ruling, arguing to the CSA that the trial court erred in its alimony award as to amount and duration by 1) consulting spousal support guidelines proposed by the AAML in addition to the factors set out in FL § 11–106(b), and 2) looking only to the parties' disparate incomes in determining duration. In an unreported opinion, the CSA rejected Boemio's allegations and affirmed the trial court. The court found that Boemio's claims concerning the AAML guidelines were contrary to the record, given that the trial court gave a fully articulated FL § 11–106(b) analysis in addition to stating that the AAML guidelines were not authoritative and did not control the court's decision. As for Boemio's contention concerning the duration of Seixas' alimony award, the CSA found that the trial court considered circumstances beyond income in determining Seixas' need for indefinite rather than rehabilitative alimony.

Boemio petitioned this Court for a Writ of Certiorari, which we granted to answer the following question:

Did the trial court erroneously rely upon "alimony guidelines" which are not authorized by statute or rule in determining the amount and duration of alimony awarded to the appellee?

Because we answer in the negative, we will affirm the judgment of the intermediate appellate court.

## DISCUSSION

### I. Standard of Review

 "An alimony award will not be disturbed upon appellate review unless the trial judge's discretion was arbitrarily used or the judgment below was clearly wrong." *Solomon v. Solomon,* 383 Md. 176, 196, 857 A.2d 1109, 1120 (2004) (*quoting Tracey v. Tracey,* 328 Md. 380, 385, 614 A.2d 590, 593 (1992)). "[A]ppellate courts will accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings." *Tracey,*

328 Md. at 385, 614 A.2d at 593. "Thus, absent evidence of an abuse of discretion, the trial court's judgment ordinarily will not be disturbed on appeal." *Solomon,* 383 Md. at 196, 857 A.2d at 1120.

## II. Analysis

Title 11 of the Family Law Article governs alimony. *See* FL §§ 11–101 to 11–112. In particular, FL Section 11–106 guides courts when crafting the amount and duration of an alimony award. In making this determination, a trial court must consider the twelve factors enumerated in FL Section 11–106(b).[3] Additionally, FL Section 11–106(c) permits a court to award indefinite alimony, if it finds that:

---

3. These are as follows:

(b) *Required considerations.*—In making the determination, the court shall consider all the factors necessary for a fair and equitable award, including:

(1) the ability of the party seeking alimony to be wholly or partly self-supporting;

(2) the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment;

(3) the standard of living that the parties established during their marriage;

(4) the duration of the marriage;

(5) the contributions, monetary and nonmonetary, of each party to the well-being of the family;

(6) the circumstances that contributed to the estrangement of the parties;

(7) the age of each party;

(8) the physical and mental condition of each party;

(9) the ability of the party from whom alimony is sought to meet that party's needs while meeting the needs of the party seeking alimony;

(10) any agreement between the parties;

(11) the financial need and financial resources of each party, including:

(i) all income and assets, including property that does not produce income;

(ii) any award made under § § 8–205 and 8–208 of this article;

(iii) the nature and amount of the financial obligations of each party; and

(iv) the right of each party to receive retirement benefits; and

(12) whether the award would cause a spouse who is a resident of a related institution as defined in § 19–301 of the Health—General

(1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; or

(2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

Boemio contests the trial court's indefinite alimony award of $3,000 per month to Seixas. Specifically, he contends that the trial court erred by "abandon[ing]" an analysis of the twelve factors required under subsection (b) and the considerations in subsection (c), and instead relied exclusively on the AAML guidelines to fashion the award. Before responding to Boemio's contentions, we will review the trial court's findings.

Regarding the first factor, the trial court found that, with a current annual income of $41,000, Seixas was unlikely to become entirely self-supporting. That income was unlikely to increase because Seixas possessed only a high-school diploma and lacked the computer skills necessary to advance to a more lucrative administrative assistant position. The trial court also concluded that, despite her previous experience in retail, it would be unreasonable to expect Seixas to return to a similar position because the hours would interfere with her ability to raise her minor child. The trial court noted that the second factor did not apply in this case because Seixas did not request rehabilitative alimony.

The third factor required the court to analyze the standard of living of the parties during the marriage. The trial court described the parties as "securely middle class[,]" living a lifestyle that was "comfortable, but not extravagant." Before the separation, they owned their home in Silver Spring without a mortgage, and could afford to send their youngest child to private school. The couple was "very frugal, [putting] a lot

---

Article and from whom alimony is sought to become eligible for medical assistance earlier than would otherwise occur.

of effort towards saving money for retirement, saving money for the future, saving money for their children's education."

The Circuit Court considered the duration of the marriage as required by FL Section 11–106(b)(4), which was just over twenty-one years. The court then turned to the fifth factor, and considered the monetary and nonmonetary contributions of both parties during those twenty-one years. It found that the parties' contributions to the marriage corresponded with their job earnings and responsibilities. Initially, while Seixas was working in a retail management position that "placed enormous demands upon her time," Boemio and Seixas' parents provided most of the care for the couple's two children. The roles changed as Boemio's job at the Federal Reserve Board demanded more of his time and required him to travel frequently. Seixas responded to this shift by changing careers and taking a significant pay cut so that she could adopt the role of primary caregiver.

The Circuit Court also found that neither party was at fault for the estrangement. Rather, the two simply "grew apart." Throughout the marriage, the couple maintained lives independent of each other and "didn't do a whole lot of things together unless they directly related to the family." Thus, the couple likely separated, the Circuit Court surmised, because they had nothing in common.

With regard to the eighth factor, at the time of the trial Boemio and Seixas were 49 and 48 years old, respectively. Both parties were largely mentally and physically healthy. Seixas had developed a cataract problem, which she intended to have surgically corrected.

The ninth factor required the court to consider Boemio's ability to provide alimony. The court calculated Boemio's income and then subtracted from that amount taxes and necessary expenses, including college tuition for the couple's youngest child. These computations netted a surplus income of $7,332 a month.

Regarding the tenth factor, the parties had not entered into any enforceable contracts with each other. A verbal, informal

agreement did exist, however, whereby both would assist their youngest son in obtaining a college degree.

The Circuit Court then calculated the financial needs and resources of each party. It considered Boemio's $7,332 monthly disposable income. After analyzing Seixas's income and expenses, including the primary care of the couple's youngest child, the court found that she was living with a deficit of $1,726 per month. The court also assessed the value of the couple's assets, as required by FL Section 11–106(b)(11).[4]

The sole reference to the AAML guidelines occurred following the court's analysis of the eleventh factor. At that point, the court was attempting to craft an alimony award that properly incorporated both the quantitative and qualitative considerations of FL Section 11–106. The judge was careful to explain that he referred to the guidelines "for informational purposes only[,]" and that they did not control the court's decision. He added that the guidelines were not authoritative, and were "subject to all of the factors" articulated in the Family Law article.

The AAML guidelines consist of two formulas, one to calculate the amount of an alimony award, and the other to establish its duration. *See* Mary K. Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance,* 21 J. Am. Acad. Matrimonial Law. 61, app. A (2008). The guidelines also provide "deviation factors" that may signal a necessary adjustment to the recommended amount or duration.[5] *Id.* To com-

---

4. As neither party was a resident of an institution as defined in Section 19–301 of the Health—General Article, the twelfth factor did not apply.

5. The AAML guidelines list the following ten circumstances as "deviation factors:"

 1) A spouse is the primary caretaker of a dependent minor or a disabled adult child;
 2) A spouse has pre-existing court-ordered support obligations;

pute the amount of alimony, the adjudicator is to take 30% of the payor's gross income and subtract from it 20% of the payee's income. *Id.* at 78. This amount, however, cannot exceed 40% of the combined gross income of the parties when added to the gross income of the payee. *Id.* To determine the duration of the award, the AAML guidelines suggest multiplying the length of the marriage by one of the following factors: for zero to three years, a factor of 0.3; for three to ten years, a factor of 0.5; for ten to twenty years, a factor of 0.75; and for more than twenty years, permanent alimony. *Id.* at app. A. In this case, the formulas produced a permanent alimony award of $3,816 per month. The trial court, however, rejected that amount as too much. Instead it awarded Seixas $3,000 per month.

Boemio objects to the Circuit Court's consultation of the AAML guidelines. He contends that they improperly influenced the court's decision as to the amount and the duration of the alimony. We address these arguments below.

### A. Amount

Boemio contends that the trial court inappropriately supplanted its analysis of the FL Section 11–106(b) factors with the AAML formula. He bases this argument on the court's decision to award $3,000 per month, notwithstanding it's determination that Seixas's monthly deficit was only $1,729. In

---

3) A spouse is complying with court-ordered payment of debts or other obligations (including uninsured or unreimbursed medical expenses);

4) A spouse has unusual needs;

5) A spouse's age or health;

6) A spouse has given up a career, a career opportunity or otherwise supported the career of the other spouse;

7) A spouse has received a disproportionate share of the marital estate;

8) There are unusual tax consequences;

9) Other circumstances that make application of these considerations inequitable;

10) The parties have agreed otherwise.

Mary K. Kisthardt, *Re-thinking Alimony: The AAML's Considerations for Calculating Alimony, Spousal Support or Maintenance,* 21 J. Am. Acad. Matrimonial Law. 61, app. A (2008).

Boemio's view, the court did not articulate any findings that would justify an increase of $1,271 per month over Seixas's monthly deficit.

■ Boemio's attack on use of the AAML guidelines seems premised on the assumption that the court's award *must* be capped at an amount that the court determines to be a spouse's reasonable needs for day to day living, without regard to saving, funding a retirement, or onetime expenses. In the vast majority of divorce cases, courts' awards will be capped in such a way by necessity—the increase in expenses when a couple lives apart rather than together is not matched by a correlating increase in income. But this is not always true.

Here, for example, in light of the pattern of savings demonstrated during the marriage, the Circuit Court was free to decide that it was fair and equitable to award Seixas an amount of alimony higher than what would suffice to pay her existing monthly bills. The Circuit Court explained its exercise of discretion by saying, with respect to her current financial statement:

> [T]hat's a very artificial and unrealistic view of her needs, because it looks at her current situation, based upon the fact that her husband left the family home, and took certain actions that, sort of, imposed this condition upon her. So that ... she had no house payment. And yet, clearly, the house is going to be sold. She'd have to buy a house. Under the current situation, it doesn't make any provision for her to ... be able to have any savings. And yet, clearly, this was a family that, instead of buying things, was very good about saving money. And that's part of the lifestyle. They devoted their energies towards ... saving for the rainy day. Saving for the future. And under the financial statement, that's not provided for.
>
> They went out to the theater. That's not provided for under her current situation. She's not doing that. She's not going to the movies. So that's why I found that the financial statement, as prepared, really doesn't permit her

to maintain the lifestyle that she enjoyed during the course of the marriage.

We see two points made by the Circuit Court in its analysis set forth above: (1) expenses shown on Seixas's financial statement were not static, and (2) savings, which were not included on the financial statement, were part of the pattern of the couple's lives during the marriage. The Circuit Court acted within its discretion in declining to limit its award to the monthly expenses it found Seixas needed based on her current financial statement.

Additionally, as FL Section 11–106(b) requires, a court must consider, in making its award, the monetary and non-monetary contributions of the parties to the family as well as the standard of living that the parties established during their marriage. Here, the court found that Seixas's sacrifices during the marriage enabled Boemio to advance his career and succeed financially. The record reflects that Seixas reduced her earnings by leaving higher paying jobs in order to have more time to devote to the children. This is a legitimate and important consideration.

■ The second prong of Boemio's attack on the court's use of the AAML guidelines is more direct—he insists that because the court noted what the alimony award *would have been* under the guidelines, it must have relied exclusively on the AAML guidelines to calculate the final judgment. We are not persuaded by his logic. The Circuit Court clearly engaged in the required considerations under Section 11–106(b). Boemio conveniently ignores the court's statements that the guidelines were "not authoritative[,]" were used "for informational purposes only[,]" and "[did not] control the Court's decision." Nor does he acknowledge the court's express rejection of the $3,816 amount as "excessive." In short, Boemio has failed to prove his charge that the court completely discarded its obligatory FL Section 11–106(b) analysis.

To be sure, the Circuit Court consulted the AAML formulas, and a careful reading of the transcript compels the conclusion that the AAML guidelines played a role in its

decision. "Playing a role" is different from being the exclusive or dispositive criterion. Yet, we still must decide whether a court's substantive consideration of these guidelines, along with the FL Section 11–106 factors, is a legitimate exercise of the Circuit Court's discretion.

It is well-settled that Section 11–106 does not preclude a trial court from considering other factors in addition to the twelve mentioned. *See Solomon*, 383 Md. at 195 n. 15, 857 A.2d at 1120 n. 15 ("The twelve factors included in the test are non-exclusive...."). As the introductory language of subsection (b) provides, "[i]n making the determination, the court shall consider *all* the factors necessary for a fair and equitable award, *including* [the twelve listed]." *See* FL § 11–106(b)(emphasis added); *see also Roginsky v. Blake–Roginsky,* 129 Md.App. 132, 143, 740 A.2d 125, 130 (1999), *cert. denied,* 358 Md. 164, 747 A.2d 645 (2000) ("As the prefatory language in subsection (b) makes plain, the court is not restricted to a consideration of the factors that are expressly listed."). While the statute provides factors, it gives the court little guidance on how to translate them into dollars. We believe that *if* the guidelines reasonably direct the court to a fair and equitable award without supplanting or frustrating any one of the twelve enumerated statutory considerations, a court may refer to them as an aid in translating its statutorily mandated analysis into a dollar amount.

In deciding whether use of monetary guidelines like the AAML's will supplant or frustrate the statutory guidelines, we first consider what role monetary guidelines will play when applied in the context of a statute directing use of evaluative factors, but without direction as to how they translate into a monetary amount. Commentators have addressed the practical difficulties for judges and litigants when such statutory criteria are the only resource available:

> Of the three financial issues raised by divorce—asset division, child support, and spousal maintenance—the question of alimony is typically the least predictable and the most contentious.... On the issue of child support, while there

remains room for bargaining by higher-income parents, most couples settle within the shadow, if not by strict application, of statutory child support guidelines. Only with regard to alimony is there no fixed frame of reference for discussions.

Spousal support negotiations are particularly difficult because of the absence of any objective standard for judging fairness or predicting outcomes. **Statutes simply list factors for trial courts to consider without providing any guidance as to how the judge should weigh or apply them.** Without predictable judicial parameters, the parties cannot readily assess the risks and benefits of pushing forward to trial, thereby making private resolutions problematic.

\* \* \*

At first reading, these legislative guidelines for awarding alimony appear fair and appropriate. Closer inspection, however, reveals that the statutory criteria are so broad, idiosyncratic, or unclear in purpose or direction that they actually provide little practical guidance for—or limitation upon—judicial discretion.

The majority of the statutory factors are laudable but imprecise, such as the instruction for a judge to take into account "a history of the contributions to the marriage by each party." [ 6]

\* \* \*

[T]he statutes are [also] uniformly silent as to the manner in which the factors should be utilized to calculate an award. Not a single jurisdiction among those that list multiple alimony considerations ranks the factors' relative significance or weight. Not a single statute explains how judges

---

6. This language is similar to the fifth factor presented in FL Section 11–106(b): "the contributions, monetary and nonmonetary, of each party to the well-being of the family[.]" Md. Code (1984, 2006 Repl. Vol.) § 11–106(b)(5) of the Family Law Article.

should apply the criteria. The result is that both the trial and appellate courts look to a hodgepodge of factors, weighing them in an unspecified and unsystematic fashion, rendering it impossible for couples or their counsel to predict with any degree of certainty what the actual alimony award might or should be.

Robert K. Collins, *The Theory of Marital Residuals: Applying an Income Adjustment Calculus to the Enigma of Alimony*, 24 Harv. Women's L.J. 23, 23, 32–33 (2001) (quotation marks and citations omitted) (emphasis added) (footnote added).[7]

Numerous courts across the country have resorted to non-legislative formulas as aids in crafting alimony awards. *See generally* Virginia R. Dugan & Jon A. Feder, *Alimony Guidelines: Do They Work?*, 25 Fam. Advoc. 20 (2003) (describing the alimony guidelines developed in twelve different jurisdictions, including California, Florida, Maine, Michigan and Texas). For example, Maricopa County, Arizona,[8] frames its alimony awards around a "duration factor," which is 0.015 times the number of years of the marriage. *Id.* at 20. That number is then multiplied by the difference in the parties' incomes to render the final amount. *Id.* In Kansas, several

---

7. *See also* Victoria M. Ho & Stephanie A. Sussman, *Appellate Court Trends in Permanent Alimony for "Gray Area" Divorces: 1997–2007*, 82 Fla. Bar J. 45, para. 19 (2008) ("The research and analysis relating to permanent alimony cases over the past 10 years is both an informative and frustrating endeavor. Any preconceived notion that more predictable trends would have emerged over time did not hold true. In fact, it seems like the more appellate decisions that are handed down on this subject, the more unpredictable alimony awards become.... The only firm conclusion one can make in this exhaustive review of alimony awards in Florida is that the trier of fact will take all facts presented to him or her and will fashion a decision based on all the equities. Absent alimony guidelines, this area will always be difficult to predict as equity is often—like beauty—in the eye of the beholder.")

8. The Maricopa County Guidelines explain that "they are intended to provide the court and the parties with a starting point for discussion, negotiation, or decision making" and are not meant to "replace the court's obligation to consider the specific evidence and statutory factors." *Cullum v. Cullum*, 215 Ariz. 352, 160 P.3d 231, 235 (App.2007) (citation and quotation marks omitted).

counties use what is known as the "Johnson County Guidelines," which provide that alimony should be twenty percent of the difference between the parties' gross monthly incomes when there are minor children and twenty-five percent of the difference when there are no children. *Id.* at 21. The Fairfax County Virginia Bar Association recommends that spousal support equal thirty percent of the payor's income minus fifty percent of the payee's income in cases where there is no child support. *See* Kisthardt, *supra,* at 77. Where there is child support being paid, the formula is twenty-eight percent of the payor's income minus fifty-eight percent of the payee's income. *Id.*

These guidelines provide predictability for both counsel and clients, increasing litigant satisfaction: "Experienced attorneys in California, where guidelines have been used [since 1977], have found clients accept the concept of guidelines much more readily than broad ranges of results when guidelines are not used." *See* Hon. Robert E. Gaston, *Alimony: You Are the Weakest Link! Part 2,* 10 Nev. Law. 36, 37, 38 (2002) (*quoting* George Norton, "The Future of Alimony: A Proposal for Guidelines," *Alimony, New Strategies for Pursuit and Defense,* Section of Family Law, American Bar Association (1988)). We do not mention these examples to indicate that the specific numeric formulas are necessarily right for Maryland. We use them to demonstrate that many courts, with statutes setting forth evaluative criteria, have considered it beneficial to utilize monetary guidelines as an aid in reaching their decisions.[9]

The AAML guidelines were the result of more than two years of data-gathering by the AAML Commission.[10] *See*

---

**9.** None of the guidelines mentioned above are required by statute, but are instead applied at the discretion of the respective courts.

**10.** The AAML Commission was created in 2003 by AAML President Sandra Joan Morris. *See* Kisthardt, *supra,* at 61. The Commission was tasked with critically reviewing the American Law Institute's Principles of the Law of Family Dissolution: Analysis and Recommendations (2002), to analyze those principles, and to make recommendations

Kisthardt, *supra,* at 78. After extensively reviewing guidelines beings used in jurisdictions around the country, the Commission discovered that the common denominators in all were the income of the spouses and the duration of the marriage. *Id.* Thus, the AAML guidelines focused on those two factors. *Id.* The formula was then tested against seven other guidelines that were being used or had been proposed, and the result fell within the norm. *Id.* Also, "[r]ecognizing that certain circumstance[s] would render an award based solely on the [AAML formula] unfair, the Commission also included factors that would suggest a deviation." *Id.* As the AAML explained in the introduction to the guidelines, "[t]he proposed considerations are designed to be used in conjunction with state statutes that first determine eligibility for an award. They are not intended to replace existing state public policy regarding eligibility for an award." *See* AAML, *Considerations when Determining Alimony, Spousal Support or Maintenance* 2 (2007).

We believe that the AAML recommendations are the product of a careful study by a professional organization of knowledgeable practitioners, which are reasonable in approach, and do not supplant FL Section 11–106 or frustrate its goals. We consider these, and other legitimate and neutral guidelines, helpful to judges making alimony awards in Maryland.[11] Therefore, we conclude that the court did not err in

---

consistent with AAML's mission. *Id.* (noting that the AAML was designed "to encourage the study, improve the practice, elevate the standards and advance the cause of matrimonial law, to the end that the welfare of the family and society be protected.").

**11.** Recently, the Kaufman Center for Family Law produced its own set of guidelines ("Kaufman Guidelines"), which are specifically tailored to address the twelve factors listed in FL Section 11–106(b). *See* Kaufman Center for Family Law, *Kaufman Alimony Guidelines, available at* http://www.kaufmanalimonyguidelines.org/how.html (last visited Apr. 27, 2010). The Kaufman Guidelines "rank alimony cases along a [linear] continuum of strength of the case from the case that is least justifiable for alimony to the case that is most justifiable." Kaufman Center for Family Law, *Kaufman Alimony Guidelines, available at* http://www.kaufmanalimonyguidelines.org/theory.html (last visited Apr.

consulting those guidelines after conducting its statutory analysis.[12] Rather, the court made an effort to be fair and equitable, as well as being mindful of the benefits of consistency in alimony awards for family law practitioners, litigants, and judges. We wish to be clear, however, that our decision in this case does not mandate the use of any guidelines by circuit courts in performing their Section 11–106 analyses. As we explained in *Solomon*, "each case must be evaluated on its facts and not on some fixed minimum or universal standard." 383 Md. at 198, 857 A.2d at 1122. Thus, in applying FL Section 11–106(b), circuit court judges may wish to consult no monetary guidelines, one particular set of guidelines, or a combination of guidelines. The knowledge, experience and judgment of the circuit court judges are the best determinants for making awards that are "fair and equitable" under FL Section 11–106(b).

### B. Duration

Boemio also challenges the trial court's award of indefinite alimony under FL Section 11–106(c). He contends that the Circuit Court should have ordered alimony for a fixed period of time which would be sufficient to rehabilitate Seixas and allow her to be self-supporting. FL Section 11–106(c)(2)

---

27, 2010). The two primary elements of the guidelines are (1) the claimant's present or potential ability to support herself or himself, and (2) the degree to which the marriage affected the claimant's ability to support herself or himself. *Id.* The guidelines are presented in a web-based program, whereby the user answers certain factual questions, and the Kaufman calculator computes the strength of the case and recommends the amount and duration of alimony. *Id.* The Women's Law Center of Maryland provides the computer program free of cost to attorneys and the judiciary. These guidelines are not intended to supplant ML Section 11–106(b), and as indicated, are tailored to that section. In affirming the Circuit Court's use of the AAML Guidelines in this case, we are by no means suggesting that the AAML Guidelines are preferable to the Kaufman Alimony Guidelines. The latter were not released until 2008 and, thus, were unavailable for use at the time this case was tried.

**12.** Use of these guidelines was not a surprise to the litigants or counsel. During a pretrial meeting, the trial court made counsel aware of its intention to consult the AAML guidelines.

permits a court to award indefinite alimony, as compared with fixed-term alimony if "the respective standards of living of the parties [would] be unconscionably disparate" after "the party seeking alimony [has] made as much progress toward becoming self-supporting as can reasonably be expected. . . ."

The Circuit Court explained its decision to award indefinite alimony, reinforcing some of the points we have described above, and found an unconscionable disparity in the spouses' respective standards of living:

[R]eturning to the issue of the needs of the parties, based upon what I said, that is, that the analysis was done based upon what she needs, given the circumstances that she is currently in.

**I do find that that is not reflective of the style that the parties maintained during the course of the marriage.** And that, to maintain the style to which the parties were accustomed during the course of the marriage, she would need additional funds.

The current situation reflects no house payment. There's little, if any going out to the movies. There's no provision for her to create any savings. And, as I said, this family was a frugal family. Instead of having a lot of things that they purchased, they saved a lot of money. They saved for the future. And she, now, is unable to do that, based upon her current situation under the analysis that I made, using the figures that I used.

So, I do think that it is not appropriate to simply just look at that as the only figures to be considered in this case. What I have concluded is that she's rehabilitated to the extent that she could be rehabilitated. . . . [T]he extent of her professional accomplishment, she's probably already reached. That is, administrative assistant.

[H]er husband makes approximately $180,000, as I've already indicated. Has a master's in business administration that he got during the course of the marriage. And I think he will certainly get his cost of livings, presumably as would she. But he has the ability to continue to perform, to

continue to succeed. And so I find, under the circumstances, that to simply leave them in their current status would leave an unconscionable disparate income in their relative standards of living. And that, under those circumstances, therefore, an award of permanent alimony is warranted.

(Emphasis added). Our task is to decide whether the Circuit Court made any clearly erroneous factual findings, or abused its discretion in making this decision. *See Solomon,* 383 Md. at 196, 857 A.2d at 1120. ("The determination of whether an unconscionable disparity exists, according to section 11–106(c) of the Family Law Article, is a finding of fact, reviewed under a clearly erroneous standard."). An alimony award "will not be disturbed upon appellate review unless the trial judge's discretion was arbitrarily used or the judgment below was clearly wrong." *Tracey,* 328 Md. at 385, 614 A.2d at 593.

This is not to say that a trial court cannot be overturned in making an alimony award. In *Solomon* we affirmed the holding of the CSA that the trial court erred in failing to award a sufficient amount of alimony to eliminate that disparity.[13] In *Simonds v. Simonds,* 165 Md.App. 591, 611, 886 A.2d 158, 170 (2005), the CSA vacated an alimony award because the trial court did not make sufficient factual findings about the FL Section 11–106(b) factors.[14] *See also, e.g., Lee v.*

---

13. As we explained,

> The Circuit Court concluded that there was an unconscionable disparity in the Solomons' incomes and standards of living and, therefore, awarded Mrs. Solomon indefinite alimony. The Court of Special Appeals upheld this determination and it has not been challenged in this Court. Yet, the Court of Special Appeals reversed the Circuit Court's determination of the amount of the indefinite alimony awarded. This is the only aspect of the indefinite alimony award currently in controversy.

> *Solomon v. Solomon,* 383 Md. 176, 197, 857 A.2d 1109, 1121 (2004).

14. The CSA in *Simonds* said: "[i]n the case at bar, the [C]ircuit [C]ourt (1) made inconsistent findings of fact on the question of appellee's *present* income, and (2) made no findings of fact on the question of appellee's *future* income. Under these circumstances, it was 'error to deny [appellant's] request [for indefinite alimony] without explicitly discussing the disparity issue.'" *Simonds v. Simonds,* 165 Md.App.

*Andochick,* 182 Md.App. 268, 957 A.2d 1038 (2008) (reversing indefinite alimony award because wife, who earned $267,000.00 per year, established disparity in income, when husband earned $1,760,282, but "fail[ed] to explain how her standard of living would be unconscionably disparate if no alimony award was made[,]" when husband was six million dollars in debt); *Rogers v. Rogers,* 80 Md.App. 575, 588–92, 565 A.2d 361, 367–70 (1989) (denial of alimony vacated with instructions to consider imbalance between wife's highest salary of $17,500 and husband's income of $115,000 plus bonuses).

"Unconscionably disparate" standards of living is the threshold test for awarding indefinite alimony under FL Section 11–106(c)(2). Although there are numerous decisions by the Court of Special Appeals addressing "unconscionable disparity," there are only a few issued by this Court. *See Solomon v. Solomon,* 383 Md. 176, 857 A.2d 1109 (2004); *Blaine v. Blaine,* 336 Md. 49, 646 A.2d 413 (1994); *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992); *Turrisi v. Sanzaro,* 308 Md. 515, 520 A.2d 1080 (1987). While the appellate decisions have provided guidance, no cohesive rubric has emerged in either appellate court to frame or add definition to the bare statutory term. We think this is so because the statute, at its core, relies on principles of equity, which are flexible and not conducive to black-letter restatement.[15]

 Alimony itself is fundamentally equitable:

---

591, 611, 886 A.2d 158, 170 (2005) (*citing Kelly v. Kelly,* 153 Md.App. 260, 279, 836 A.2d 695 (2003)). The *Kelly* Court further explained that

> No case ... requires that indefinite alimony be granted simply because the dependent spouse is able to show that his or her income is only thirty percent of that of the non-dependent spouse. And, indefinite alimony is not necessarily required simply because there exists a gross disparity of income. But when indefinite alimony is denied and such a disparity exists, it is error to deny the request without explicitly discussing the disparity issue.

153 Md.App. at 279, 836 A.2d at 706.

15. Dan B. Dobbs, in a general discussion on equity, has asked

> Is equity to be applauded because it is flexible and attends to the individual case? Or deplored because it fails to explain itself or to give reasons that can be applied to like-situated parties and that can

Generally speaking, alimony awards, though authorized by statute, are founded upon notions of equity, equity requires sensitivity to the merits of each individual case without the imposition of bright-line tests. The 1980 [Governor's Commission] Report[, which proposed Maryland's alimony statute,[16]] specifically stated its belief that "different ills call for different remedies"; and that "the matter of relative standards of living [is] to be resolved, as it seems to us it must be, on a case-by-case basis."

*Tracey,* 328 Md. at 393, 614 A.2d at 597 (citing *Wallace v. Wallace,* 290 Md. 265, 284, 429 A.2d 232, 243 (1981)) (footnote added). As such, "no hard and fast rule can be laid down, and . . . each case must depend upon its own circumstances. . . ." *Alston v. Alston,* 331 Md. 496, 507, 629 A.2d 70, 75 (1993). Furthermore, we said in *Tracey:*

We have previously defined the purpose of the statute as providing for an appropriate degree of spousal support in the form of alimony after the dissolution of a marriage. In regard to the appropriateness of such support, the statute itself requires that the trial court weigh all factors **relevant to "a fair and equitable award."** [FL] Section 11–106(b). The statute elsewhere invokes the **equitable concept of unconscionably disparate standards of living.** [FL] Section 11–106(c)(2). Its sister provision governing the extension of an alimony period permits the court to act to avoid **"a harsh and inequitable result."** [FL] Section 11–107(a)(1). We conclude from these provisions that **the paramount goal of the legislature was to create a statutory mechanism leading to equitably sound alimony determinations by judges.**

---

be justified in principle? It is no doubt both. Great care is required to make the system respect the full legal and moral rights of parties. Dan B. Dobbs, *Law of Remedies* 117–18 (2d ed. 1993)

**16.** The 1980 Report was developed for the benefit of the legislature by the Governor's Commission on Domestic Relations Laws. *Turrisi v. Sanzaro,* 308 Md. 515, 526, 520 A.2d 1080, 1085 (1987).

328 Md. at 388, 614 A.2d at 594–95 (emphasis added) (some citations omitted); *see also Solomon*, 383 Md. at 197–98, 857 A.2d at 1121 (reiterating the equitable nature of alimony and quoting from *Tracey* ); *Blaine*, 336 Md. at 66, 646 A.2d at 421 (stating that a number of enumerated statutory factors are equitable and reflect "concepts, for the most part [that are] already in existence in Maryland common law. . . .").

In *Solomon*, Judge Harrell explained:

It is well settled in Maryland that the statutory scheme generally favors fixed-term or so-called rehabilitative alimony, rather than indefinite alimony. Underlying Maryland's statutory preference is the conviction that the purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently. Nonetheless, rehabilitative alimony alone may not be appropriate in every case.

*Solomon*, 383 Md. at 194–95, 857 A.2d at 1119 (citations and quotation marks omitted). As we explained in *Blaine*, FL Section 11–106 includes "provisions for indefinite alimony [which] serve as a restraint upon the doctrine of rehabilitative alimony. . . ." *Blaine*, 336 Md. at 70, 646 A.2d at 423.

 Turning now to Boemio's specific arguments, we start with his contention that the trial court's award should be reversed because there was only disparity in income and no demonstration of unconscionable disparity in the parties' standards of living. Boemio contends that "the trial court's task in determining the length of the alimony award was made easier by its simplistic, yet erroneous, application of the AAML guidelines which instruct that a marriage of twenty years requires indefinite alimony."

Our response to this argument is two-fold. First, as we explained above, the Circuit Court used the AAML guidelines as a tool, but did not consider itself bound by them, and it clearly considered the FL Section 11–106(b) factors. Second, the statute itself directs that judges must consider the length of the marriage as part of their evaluations. It is obvious,

then, that the legislature decided that a long marriage called for more alimony than a short one.

█ To award indefinite alimony in a twenty-year marriage is not at all unusual. There has long been a pattern in Maryland cases reflecting the implied statutory directive that a long marriage is more likely to result in indefinite alimony.[17] Indeed, it is fair to say that length of the marriage is a key factor, outweighing several of the others listed in FL Section 11–106(b), in determining what is unconscionably disparate. Thus, the trial court's use of the twenty-year benchmark from the AAML guidelines for its award of indefinite alimony is not at all inconsistent with Maryland law.

Boemio also contends that the court awarded indefinite alimony because it found that the parties had "an unconscionable disparity in *income* [.]" He uses this excerpt from the Circuit Court's opinion to support his argument that the court focused on income rather than the disparate standards of living, as required by FL Section 11–106(c). This, however, was not a complete quotation of what Judge Mason said. The full sentence as stated by the Circuit Court judge was, "And so I find, under the circumstances, that to simply leave them in their current status would leave an unconscionable disparate income *in their relative standards of living.*" (Emphasis added). This sentence demonstrates that the court fully understood the standard set by FL Section 11–106(c)(2).

---

17. *See e.g., Tracey v. Tracey,* 328 Md. 380, 382, 614 A.2d 590, 592 (1992) (26 years); *Turner v. Turner,* 147 Md.App. 350, 361, 809 A.2d 18, 24 (2002) (30 years); *Innerbichler v. Innerbichler,* 132 Md.App. 207, 213, 752 A.2d 291, 294 (2000) (14 years); *Digges v. Digges,* 126 Md.App. 361, 363, 730 A.2d 202, 203 (1999) (26 years); *Crabill v. Crabill,* 119 Md.App. 249, 258, 704 A.2d 532, 536 (1998) (18 years); *Caldwell v. Caldwell,* 103 Md.App. 452, 455, 653 A.2d 994, 995 (1995) (26 years); *Blaine v. Blaine,* 97 Md.App. 689, 693, 632 A.2d 191, 193 (1993) (18 years); *Broseus v. Broseus,* 82 Md.App. 183, 189–90, 570 A.2d 874, 877–78 (1990) (19 years); *Bricker v. Bricker,* 78 Md.App. 570, 576, 554 A.2d 444, 447 (1989) (25 years); *Zorich v. Zorich,* 63 Md.App. 710, 718, 493 A.2d 1096, 1100 (1985) (30 years); *Kennedy v. Kennedy,* 55 Md.App. 299, 300–01, 462 A.2d 1208, 1210–11 (1983) (22 years).

■ Boemio continues with his challenge, insisting that the Circuit Court was overly focused on income (along with length of marriage) to the exclusion of the other statutory factors. To be sure, trial courts must make findings about all of the 11–106(b) factors, and *all factors must be considered.* But we also must be pragmatic in recognizing that a disparity in income is necessarily going to play a highly significant role in making a finding that "the respective standards of living of the parties will be unconscionably disparate." FL § 11–106(c). In this context, "standards of living" means how well the respective parties *can* live based on their respective financial means.[18]

In *Solomon,* we recognized a line of older cases from this Court and the CSA, indicating that the difference in income is an important factor in assessing whether an unconscionable disparity exists:

> There are several cases in which Maryland appellate courts found unconscionable disparity based on the relative percentage the dependent spouse's income was of the other spouse's income. *See Tracey,* 328 Md. at 393, 614 A.2d at 597 (28 percent); *Caldwell v. Caldwell,* 103 Md.App. 452, 464, 653 A.2d 994, 999 (1995) (43 percent); *Blaine v. Blaine,* 97 Md.App. 689, 708, 632 A.2d 191, 201 (1993), *aff'd on other grounds,* 336 Md. 49, 646 A.2d 413 (1994) (23 percent); *Rock v. Rock,* 86 Md.App. 598, 613, 587 A.2d 1133, 1140 (1991) (20–30 percent); *Broseus v. Broseus,* 82 Md.App. 183, 186, 570 A.2d 874, 880 (1990) (46 percent); *Bricker v. Bricker,* 78 Md.App. 570, 577, 554 A.2d 444, 447 (1989) (35 percent);

18. Boemio argues that since the separation, he resides in a two-bedroom apartment in Switzerland with a monthly rental of $1,438.76 and engages in modest spending habits so as to incur little personal debt. Thus, according to Boemio, the parties' lifestyles do not diverge as dramatically as their salaries. The choice of the payor spouse to live in an apartment between the separation and trial will not dictate what the court will determine to be as "the respective standards of living" under FL Section 11–106. If the court relied only on a snapshot of the parties' lives it would be too easy for a party to manipulate the result. When a court compares standards of living, it should project those standards for the future, based on all of the available evidence.

*Benkin v. Benkin,* 71 Md.App. 191, 199, 524 A.2d 789, 793 (1987) (16 percent); *Zorich v. Zorich,* 63 Md.App. 710, 717, 493 A.2d 1096, 1099 (1985) (20 percent); *Kennedy v. Kennedy,* 55 Md.App. 299, 307, 462 A.2d 1208, 1214 (1983) (33 percent).[ [19] ]

383 Md. at 198, 857 A.2d at 1121 (footnote added).

The Circuit Court's decision to find that the disparity in standards of living was unconscionable was consistent with this settled law. Currently, Boemio earns four times what Seixas earns, and Judge Mason found that Seixas was unlikely to be capable of earning substantially more than that. As shown above, Maryland cases have awarded indefinite alimony where the income disparity has been considerably less drastic. *See Digges v. Digges,* 126 Md.App. 361, 389–90, 730 A.2d 202, 218–19 (1999) (discussing numerous cases where indefinite alimony was awarded when the parties seeking alimony earned less than half of the other spouses' incomes).

But the trial court's decision here was based on more than just income differential. The court considered the parties's lifestyle before the separation, characterizing it as "securely middle class" and "quite a comfortable lifestyle." It also noted that Boemio's Masters in Business Administration, which would enable him to advance in his career even beyond his current level, was acquired during the marriage.[20] *See Solomon,* 383 Md. at 201, 857 A.2d at 1123 ("[The wife's] work in the home no doubt contributed to [the husband's] success in building his professional career.") The family model of one parent serving as the primary caregiver and the other serving

--------

**19.** We went on to say that

Although we do not adopt a standard that unconscionable disparity exists based on a particular percentage comparison of gross or net income, the relative percentages in these cases offer some guidance here in assessing whether the amount of the indefinite alimony award alleviated adequately the unconscionably disparate situation found to exist in the present case.

*Solomon,* 383 Md. at 176, 857 A.2d at 1121–22.

**20.** Boemio started his studies for the degree in 1984, the year before the marriage, and finished them in 1988, three years after it.

as the primary breadwinner can work well, with benefits to all, until divorce. But when divorce occurs, the primary breadwinner is likely to suffer less monetary loss than the caregiver parent, while both will share in the priceless benefit of having children. This asymmetry is certainly a legitimate consideration in determining unconscionability.

Judge Mason summed up his decision to award permanent alimony as follows:

> He makes more than four times what she makes. Under the circumstances, I find, and considering the duration of the marriage, which is significant, the fact that he acquired the MBA during the marriage. The fact that she obviously provided him a lot of support and assistance during the marriage, which allowed him to succeed the way that he did succeed, that an award of indefinite alimony in the amount of $3,000 a month is appropriate.

The trial court did not abuse its discretion in awarding indefinite alimony based on these factors. The court had evidence of a relatively lengthy marriage, the payor spouse acquiring an advanced degree with the support of the payee spouse during the marriage, the recipient spouse leaving more lucrative employment to care for the children, a comfortable middle class lifestyle that permitted accumulation of savings by the parties during the marriage, and a large income disparity thereafter.

## CONCLUSION

Judge Mason diligently conducted the alimony analysis mandated by FL Section 11–106 when determining the amount of the award, and did not abuse his discretion when he consulted the AAML guidelines to refine his analysis and arrive at the sum of $3,000 per month. Furthermore, the Circuit Court's finding that an unconscionable disparity existed between the parties' standards of living so as to warrant indefinite alimony did not depend on clearly erroneous factual findings, nor was it an abuse of discretion. Thus, we affirm the CSA's decision to affirm the Circuit Court.

JUDGMENT OF THE COURT OF SPECIAL APPEALS
AFFIRMED. COSTS TO BE PAID BY PETITIONER.